change that I had in my pocket."  MONTILLA stated that he "had

problems" and ROSARIO told him: "the guy called me and told me

that he would see me in a little while."  In response, MONTILLA

stated: "I'm going to send Luis because I have to chill out for

right now."  ROSARIO and MONTILLA then discussed how much money

ROSARIO owed and MONTILLA stated that it was "thirty something."

MONTILLA then stated: "If he would've done that on time, this

would have never happened."

        115.  At approximately 7:59 p.m., ROSARIO called VELASQUEZ at

telephone number (978) 590-1716.  During the call, ROSARIO told

VELASQUEZ: "that man is angry because they took his chelitos

away." VELASQUEZ asked "his" and ROSARIO stated: "yours, what I

had."  ROSARIO then told VELASQUEZ: "If you would've done it

earlier that wouldn't have happened."  VELASQUEZ asked if it was:

"those people over there?" and ROSARIO stated that it was "the

ones with the badge."  VELASQUEZ told ROSARIO to tell them that

his: "money will show up."  ROSARIO stated, "I told him, that man

isn't like that"  and VELASQUEZ responded: "I've managed more

money than that."

        116.  On March 13, 2004, MONTILLA, ROBLES and a female who

identified herself as Santa Reed arrived at the State Police

Barracks in Andover, MA to request the return of the currency

seized the day before.  Reed told Troopers that MONTILLA obtained

the currency from his godmother and showed them a photocopy of

the front of a check in the name of Ana Hernandez for

approximately $2,200.  Reed further stated that they needed the money to purchase a barber shop.  Reed had been intercepted over Target Telephone #1, two days earlier, on March 11, 2004, yelling at ROSARIO for not answering MONTILLA's calls and not paying the money he owed to them.

**TUTO, ROSARIO, 73 East Haverhill Street #2A, Lawrence, MA**

117. On March 12, 2004, at approximately 10:57 a.m., ROSARIO called TUTO at (978) 682-6409, a residential telephone subscribed to Jose GARABITO and installed at 73 East Haverhill Street, #2A, Lawrence, MA.  ROSARIO asked TUTO if he could "go over there now?" and TUTO stated: "yes, I'm by myself."  At approximately 11:22 a.m., agents arrived in the vicinity of TUTO's residence at 73 East Haverhill Street, Lawrence, MA and observed ROSARIO's gray Oldsmobile, MA Reg. 62FG11, parked in front of the building. At approximately 11:38 a.m., agents observed ROSARIO exit 73 East Haverhill Street and enter Passion Market, 71 East Haverhill Street, Lawrence, MA.  After a few minutes, ROSARIO exited Passion Market with a bag and depart in the gray Oldsmobile.  I believe ROSARIO and TUTO engaged in a drug transaction.

**March 14, 2004**

**CASTRO, MONTILLA, 1 ClockTower Place #114, Nashua, NH**

118. At approximately 5:28 p.m., CASTRO called ROSARIO on Target Telephone #2.  ROSARIO stated: "I have something for you" and CASTRO stated that he was in "Lawrence" near where ROSARIO "works".  ROSARIO stated that he was on his "way over there now"

and asked CASTRO to go by there to "talk".   CASTRO told ROSARIO
that he was going to "JOSE's" (a reference to MONTILLA).

119. At approximately 5:40 p.m., surveillance was
established in the vicinity of MONTILLA's residence at 22 Hilltop
St., Lawrence, Ma and observed CASTRO's blue  BMW, NH Reg
1585318, parked on the street in front of the residence.  At 6:22
p.m., agents observed the BMW depart from 22 Hilltop Street.

120. About 12 minutes later, at 6:34 p.m. agents observed
the BMW park on Bailey St, in the vicinity of JIMENEZ GROCERY.
Agents then observed an Hispanic male identified as CASTRO based
on a New Hampshire driver's licence, exit the vehicle, talking on
a cell phone and walk into JIMENEZ GROCERY.

121. At approximately 6:58 p.m., agents observed CASTRO exit
the store, enter the vehicle and depart the area.  Agents
observed a female sitting in the passenger seat of the BMW.
Agents also observed that CASTRO, driving the vehicle, had an
earing in his right earlobe in the shape of a hoop.

122. Agents followed the BMW in the driveway of 39 Palm St.
Nashua, NH.  After the car stopped for approximately 5 minutes to
drop off the female, agents observed the BMW back out of the
driveway and drive to the Clocktower Apartments in Nashua, NH.
At approximately 7:39 p.m., agents observed CASTRO exit the BMW
and walk towards the apartments.

**March 29-30, 2004 Events Regarding 500 grams - 1 Kilogram Deal**

123. On Monday, March 29, 2004, ROSARIO placed a call over

Target Telephone 1 to (978) 853-8628 and spoke with Anselmo DOMINGUEZ. ROSARIO told DOMINGUEZ that he wanted to speak to him in person, "do not say too much on the phone." ROSARIO said he was on his way over. Ten minutes later, ROSARIO placed a call over Target Telephone 1 to PATRON. Speaking in code, ROSARIO advised PATRON that he had spoken to someone (possibly DOMINGUEZ) who told him he had "one thing" but that he wanted to make sure that those are "fresh. Got it?" PATRON asked how much he wanted to pay and ROSARIO stated "four and a half". ROSARIO asked PATRON "do you think that you can get it?" ROSARIO added: "because my friend wants half right now and I need to figure it out how I am going to do it...because I may get lucky and may get one whole thing." PATRON agreed to make some calls and get back to ROSARIO. I believed that ROSARIO was advising PATRON that he been offered a half kilo or kilo of cocaine at a price of $24,500 and was asking PATRON whether he would be interested in purchasing a portion of it.

124. Shortly thereafter, ROSARIO placed another call over Target Telephone 1 and spoke with PATRON. ROSARIO advised PATRON that he had talked to the guy and "it is for getting half immediately." He added that "it has to be put at least from seven to eight pesos." PATRON advised ROSARIO that he did not have the money right then but would call and see if he could put it together. I believe PATRON was advising ROSARIO that he was interested in purchasing a half-kilogram of cocaine if he could

get the money together.

125. Later that day, ROSARIO placed a call over Target Telephone 1 to Lorenzo VELASQUEZ, a/k/a RAMON, who owes ROSARIO's associate JOSE money for a kilogram of cocaine that he had previously been given.  ROSARIO advised RAMON that there was another person but he would only do "one on top of the other".  When RAMON asked how much is he paying, ROSARIO replied "23 and a half." I believe that ROSARIO was referring to the price of $2,350 for 100 grams of coke.  RAMON and ROSARIO agreed to speak later that day about possibly purchasing the drugs.  At approximately 5:36 p.m., ROSARIO placed a call over Target Telephone 1 to (978) 394-1193 and spoke with JOSE.  ROSARIO advised JOSE, in code, that he was in the process of obtaining "one" and hoped to sell it and make money to repay JOSE his money.

126. At 6:25 p.m., ROSARIO placed a call over Target Telephone 1 to RAMON.  Ramon advised ROSARIO: "it's better for me if I sell it because I can sell it at eight."  I believe RAMON was advising ROSARIO that he was willing to pick up the 100 grams of coke, sell it for $2,800 dollars and use the profit to repay his debt to JOSE.  RAMON also appeared to advise ROSARIO that he was also in the process of trying to obtain a kilogram from another source.  When ROSARIO asked how much, RAMON replied; "I get it at the same number."  ROSARIO asked: "twenty four and a half?"  RAMON  responded: "Mn hmmm.  That's how I get it."  They

agreed to talk later. At 7:58 p.m., ROSARIO received an incoming
call over Target Telephone 1 from (978) 394-1193, and spoke with
JOSE. ROSARIO told JOSE: "he told me that he has product and if
I want it, he'll bring it to me or if I have someone to resolve
that to tell him." JOSE replied: "take it away from him." When
ROSARIO asked how much JOSE was willing to buy it for, he replied
that he would not accept it broken up. ROSARIO explained: "I
told you that I have a friend that has cash for half. Cash. I am
going to call him right now and see if he wants it and if he
doesn't want it then I'll have to sell it." JOSE replied, in
substances, that it was ROSARIO's problem to resolve the debt
however he wanted to but that JOSE needed the money right away.
At one point, ROSARIO stated: "he got 300 grams from a person but
he is not able to give it all to me. I can tell him to give me so
that I can have it stored away." JOSE advised him it was better
to have it and make "four" then to let the other person keep it
and give it to someone who is not going to able to sell it. When
ROSARIO asked: "remember the problem that happened to me?" Jose
replied: "that happened to you probably because they had you
located. How can you not stash a little bundle like that. Get
the 300 and sell it to someone. So what do you have to say."
ROSARIO replied: "I'm going to tell him to bring me what he has
and when I sell it. I sell it." JOSE urged ROSARIO to get the
300 grams and sell it but ROSARIO replied that 300 was not going
to pay the debt." I believe that JOSE was advising ROSARIO to

get the 300 grams of drugs from VELASQUEZ, sell it, and use the profit to repay a portion of the debt to him, but that ROSARIO was reluctant to store that amount of drugs giving the recent theft from his stash at 81 Blaisdell.

127. Shortly after this call, at 8:12 p.m., ROSARIO placed a call over Target Telephone 1 to RAMON and told him that he had just had a "bad" discussion with JOSE. ROSARIO stated: "I have a person there that wants half. Talk to that person and let's get him a half." RAMON replied that: "It's just that he doesn't have any. If he had some, I would of got it from him. He has the other color." When ROSARIO asked: "yellow?" RAMON replied: "yes that's all I found." RAMON also stated that he could get 200 with these people and give ROSARIO 100. They agreed to talk later. I believe that RAMON was telling ROSARIO that he would get 200 grams of cocaine and give him 100 grams to pay off his drug debt.

128. At 8:30 p.m., ROSARIO placed a call over Target Telephone 1 to (978) 394-1193 and spoke to JUAN again. Speaking in code, JOSE advised ROSARIO to "tell that guy is 24 and see if he'll break it up and get me 12. So you can take that right now." I believed JOSE was advising ROSARIO that if he got $12,000 then JOSE would sel ROSARIO a half a kilogram of cocaine. JOSE added: "well let me talk to this guy and see if he has a half that he can bring to you." ROSARIO said that he could do it tomorrow first thing. JOSE said he would talk to "this guy" and get back

to ROSARIO.   Shortly thereafter, ROSARIO received an incoming
call over Target Telephone 1 from JOSE who stated that he talked
to him and was told that he would bring ROSARIO "five hundred
pesos but I told him to tell you that those are going to be for
me got it."   ROSARIO said alright.   JOSE added: "I told him that
those are going to be to make the payments.   Got it? So he told
me that tomorrow he will be there between 8:45 and 9:00 a.m."
ROSARIO said great.   I believe that JOSE had talked with one of
his sources of supply who agreed to deliver a half kilogram of
cocaine ("500 pesos," i.e. grams) to ROSARIO in the morning.
ROSARIO agreed to have the money ready at the time the 500 grams
arrived and any profit made on the half kilogram would go towards
paying ROSARIO and VELASQUEZ drug debt.   At 9:00 p.m., ROSARIO
received an incoming call over Target Telephone 1 from Teresa
(Isa Jimenez) who said: " Do you remember that vehicle we saw
when we were coming in? Well, be careful, because I've seen it go
by here a lot."   I believe she was informing ROSARIO that she
observed police surveillance following him.

129. On March 30, 2004, at 8:20 a.m., ROSARIO placed a call
over Target Telephone 1 to Anselmo DOMINGUEZ.   ROSARIO advised
DOMINGUEZ that he had done the "errand" that they had talked
about yesterday morning.   When DOMINGUEZ asked if he had "got
it," ROSARIO replied: "Yeah, if you want, you come up here right
now.   Because the guy who is bringing that is coming over here
and then it is going back right away."   ROSARIO added: "if you

want, we can take care of that this morning before going to the gym." DOMINGUEZ stated that he would call Freddy, one of their customers: "so he can bring that over there." I believe that ROSARIO was advising DOMINGUEZ that he was making arrangements to obtain the cocaine and that DOMINGUEZ was going to contact one their customers, Freddy, to pick up money to be used to purchase the drugs.

130. At 8:36 a.m., ROSARIO placed another call over to Target Telephone 1 to DOMINGUEZ, who advised ROSARIO that he had tried calling Freddy but he wasn't answering. ROSARIO stated that he was near there and was going to speak with him directly. Shortly thereafter, ROSARIO placed a call over Target Telephone 1 to (978) 521-6971 and spoke with Freddy, making arrangements to stop by shortly. Shortly after that, a call was intercepted over Target Telephone 1 in which ROSARIO asked Freddy to open the door. Agents drive past FREDDY's residence at 139 How Street and observed ROSARIO's vehicle parked in front of the building.

131. At 8:52 a.m., ROSARIO received an incoming call over Target Telephone 1 from JOSE who asked: "are you going to able to do that." ROSARIO replied that he was working "right now on that. I'll call you back once it is ready." At 9:01 a.m., ROSARIO received an incoming call over Target Telephone 1 from DOMINGUEZ. ROSARIO advised DOMINGUEZ that he had just left Freddy and was heading over to DOMINGUEZ's place. They agreed to go to the gym first and then "take care of that". However,

ROSARIO asked: "Listen, can you do me a favor. I'm near by your house. Can you save for me those tickets until we're ready." He further explained: "the tickets because Freddy already gave me." DOMINGUEZ asked: "Oh, you want me to hold it for you?" ROSARIO said yes.  I believe that ROSARIO was advising DOMINGUEZ that he had picked up money from Freddy and wanted to store it at DOMINGUEZ's house while they went to the gym and then pick it up to be used to purchase the cocaine later that morning.

132.  During the evening of March 30, 2004 calls indicated that VELASQUEZ was bringing the 100 grams of cocaine that they previously discussed to ROSARIO at JIMENEZ GROCERY.  Shortly after the call, agents observed VELASQUEZ arrive at his residence at 187 Sanborn Street and enter the residence.  A few minutes later VELASQUEZ exited the residence and departed in his dark colored Honda.  After it was determined that he was heading in the direction of JIMENEZ GROCERY, a marked Lawrence Police unit stopped VELASQUEZ and arrested him for driving without a license. During a search incident to arrest approximately 100 grams of cocaine was found on his person.

133. Throughout the day, on March 30, 2004, ROSARIO and JOSE engaged in several additional calls regarding the delivery of 500 grams of cocaine to ROSARIO.  Later in the evening, agents observed JOSE and a female arrive at the store.  JOSE and ROSARIO were arrested by agents at the store and approximately $14,000 in cash was seized from ROSARIO.

## ITEMS TO BE SEIZED

134.   I know that drug dealers often keep quantities of drugs and drug paraphernalia, such as scales, strainers, cutting agents, and packaging material such as baggies and glassine envelopes at their residences and stash houses.  In light of the fact that drug trafficking is a continuing criminal enterprise, I know that drug traffickers will engage in their illegal activities over long time periods, and even if no longer actively trafficking narcotics, will keep records of their drug trafficking for several years.  Here, based upon the facts set forth above, I believe that the Target Subjects have been engaged in a drug conspiracy with each other and others from at least the fall of 2003.  I also know that the following is true:

a.   That large scale narcotics traffickers often purchase and/or title their assets in fictitious names, aliases or the names of relatives, associates or business entities to avoid detection of these assets by government agencies;

b.   That even though these assets are in names other than the narcotics traffickers' name, the narcotics traffickers actually own and continue to use these assets, and/or exercise dominion and control over such assets;

c.   That large scale narcotics traffickers must maintain, on hand, large amounts of U.S. currency in order to maintain and finance their on-going narcotics business;

d.   That it is common for narcotics traffickers to

maintain books, records, receipts, notes, ledgers, receipts relating to the purchase of financial instruments and/or the transfer of funds, and other papers relating to the transportation, ordering, sale and distribution of controlled dangerous substances. That the aforementioned books, records, receipts, notes, ledgers, etc. are maintained where the traffickers have ready access to them, such as in their residence, garage or other outbuildings;

e.    That it is common for large scale narcotics traffickers to secrete contraband and the proceeds of narcotics transactions in secure locations within their residences, garages or other outbuildings, their businesses, the residences of relatives and associates, safe deposit boxes and/or other locations over which they maintain dominion and control, for ready access and conceal these items from law enforcement authorities;

f.    That in order to accomplish this concealment, narcotics traffickers frequently build "stash places" within their residences, their businesses, the residences of relatives and associates, and/or other locations (including burial on the grounds thereof). That there are a number of publications available, particularly on the Internet, instructing where and how to build "stash places." Copies of these types of publications are known to be used by narcotics traffickers;

g.    That it is common for persons involved in large scale narcotics trafficking organizations to maintain evidence

relating to their obtaining, secreting, transfer, concealment
and/or expenditure of narcotics proceeds, such as: large amounts
of currency, financial instruments, precious metals and
gemstones, jewelry, books, records, invoices, receipts, records
of real estate transactions, bank statements and related records,
Certificates of Deposits, passbooks, money drafts, letters of
credit, money orders, bank drafts, cashiers checks, bank checks,
safe deposit box keys, money wrappers and other evidence of other
financial transactions. These items are maintained by the
narcotics traffickers' within their residences, garages, other
outbuildings, their businesses, the residences of relatives and
associates, safe deposit boxes and/or other locations which they
maintain dominion and control;

     h.   That large scale narcotics traffickers often
utilize electronic equipment such as computers, facsimile
machines, currency counting machines, pagers (digital display
beepers), telephone answering machines to generate, transfer,
count, record and/or store the above information described in the
above listed items A, B, C, D, E and G;

     i.   That when narcotics traffickers amass large
proceeds from the sale of narcotics, the narcotics traffickers'
attempt to legitimize these profits through money laundering
activities, including establishing apparently "legitimate"
businesses that are used to launder narcotics proceeds.  To
accomplish these goals, narcotics traffickers utilize, including,

but not limited to, domestic banks and their attendant services, securities brokers, professionals such as attorneys and accountants, casinos, real estate agents, shell corporations, business fronts and otherwise legitimate businesses which generate large quantities of currency to legitimize their illegal profits;

    j.    That the sale of controlled dangerous substances, such as heroin and cocaine generates large quantities of United States currency in small denominations (commonly referred to as "street money");

    k.    That it is common for narcotics traffickers to separate their "street money" by denomination and put this currency in rubber banded stacks, or similar methods, to facilitate counting and transportation;

    l.    That structured currency transactions are currency transactions in which a customer intentionally break down more than $10,000.00 into a series of smaller transactions, each under $10,000.00, for the purpose of evading the reporting requirements of the Bank Secrecy Act. This "structured" activity, also known as "smurfing," is accomplished by an individual, who, with the intent of having a financial institution not report the currency transactions, engages in a series of currency transactions, each under $10,000.00, at the same bank on the same day, or at different banks on different days. This "structured" activity by the individual is done for the purpose and intent of transferring

or moving large amounts of aggregate currency through the financial institutions in a manner which would avoid having the financial institutions report the actual movement of currency and/or the identities of those involved. The reporting requirements of the Bank Secrecy Act create a paper trail that can be followed to identify individuals involved in illegal enterprises and tax evasion schemes; however, by using "structured" currency transactions, an individual conducts the transactions in such a manner as to evade the reporting requirements of the Bank Secrecy Act.

m.   That deposits of large amount of currency, which include the structuring and/or breaking of a cache of funds into multiple deposits, each under $10,000.00, so as to circumvent the filing of Cash Transaction Reports (CTR's), is indicative of money laundering activities.

n.   That narcotics traffickers at times become fearful that their extravagant spending habits will bring them under scrutiny by the Internal Revenue Service or other Federal, State or Local agencies. In order to legitimize their spending, these traffickers file tax returns reporting income commensurate with the amount of money they have spent during the year which they feel can be traced and documented by the government. The source of their income reported on these returns is usually falsely stated, misleading or generic terms. Retained copies of these returns are commonly kept by the traffickers in their residence

and businesses.

      o.    That traffickers in controlled dangerous substances commonly maintain addresses or telephone numbers in books or papers which reflect names, addresses and/or telephone numbers of their associates in the trafficking organization and/or individuals involved in their money laundering activities.

      p.    That narcotics traffickers utilize cellular telephones and/or portable cellular telephones so as to make it more difficult for law enforcement authorities to identify and/or intercept their conversations.

      q.    That drug traffickers take or cause to be taken photographs of themselves, their associates, their property and their product using still and video cameras. That these traffickers usually maintain these photographs in their possession.

      r.    That the courts have recognized that unexplained wealth is probative evidence of crimes motivated by greed, in particular trafficking in controlled dangerous substances.

      s.    That narcotics traffickers commonly have in their possession, that is on their person, at their residences and/or businesses, firearms, including, but not limited to: Handguns, pistols, revolvers, shotguns, machine guns and other weapons. These firearms are used to protect and secure a drug traffickers' property. Such property may include, but is not limited to, narcotics, records, proceeds, and profits derived from narcotics

trafficking.  These firearms are also used to prevent the theft of controlled dangerous substances and to protect themselves from law enforcement officers effecting a seizure and arrest.  It has been your Affiant's experience that drug traffickers also utilize firearms to intimidate persons who owe money for controlled dangerous substances provided on consignment.

### CONCLUSION

135. I submit that the information provided above establishes probable cause to believe that the items listed in Attachment B will be found in the Target Locations, described in Attachment A, and that they constitute contraband, fruits of the crime, property used and/or intended for use in the commission of the crimes, and/or evidence of the commission of the criminal offenses described above, specifically conspiracy to distribute and possess with intent to distribute controlled substances, in violation of Title 21, U.S.C., § 846 and 841(a)(1).

CHRISTIAN BRACKETT
Special Agent
Drug Enforcement Administration

Sworn and subscribed to before me on this 31 day of March, 2004.

United States Magistrate Judge

# ATTACHMENT A

## JIMENEZ GROCERY STORE
## 112 PARKER STREET, LAWRENCE, MA

112 PARKER ST IS A ONE LEVEL STORE FRONT, GREEN IN COLOR, WITH A FRONT
ENTRANCE ON PARKER STREET. THERE ARE TWO DOORS IN THE FRONT OF THE
STORE WHICH ARE LOCATED ON PARKER STREET. THE DOOR CLOSEST TO
BAILEY STREET APPEARS TO BE THE ONLY DOOR THAT IS OPERATIONAL. ABOVE
THE DOOR IS A GREEN AWNING AND A LARGE ELECTRICAL SIGN THAT SAYS
"JIMENEZ GROCERY". THERE ARE LARGE WINDOWS ON EITHER SIDE OF THE
DOORS THAT HAVE BLACK IRON GRATES.

## 81 BLAISDELL STREET, #1, HAVERHILL, MA

81 BLAISDELL STREET IS A THREE STORY, MULTI-FAMILY HOUSE, TAN/YELLOW
IN COLOR WITH WHITE AND WOOD TRIM. THE MAIN ENTRANCE IS LOCATED IN
THE FRONT OF THE BUILDING WITH AN ADDITIONAL ENTRANCE ON THE RIGHT
SIDE OF THE BUILDING DOWN THE DRIVEWAY. THE TARGET RESIDENCE IS
LOCATED ON THE FIRST FLOOR OF THE BUILDING.

## 62 JACKSON STREET EXTENSION, #1, HAVERHILL, MA

62 JACKSON STREET EXTENSION IS A THREE STORY, MULTI-FAMILY RESIDENCE,
TAN IN COLOR WITH GREEN TRIM. THE MAIN ENTRANCE IS LOCATED IN THE
FRONT OF THE BUILDING WITH THE NUMBER "62" ON THE GREEN TRIM LOCATED
TO THE LEFT OF THE FRONT DOOR. THE BUILDING IS SURROUNDED BY A CHAIN
LINK FENCE WITH A GATE TO THE FRONT ENTRANCE AND AN ADDITIONAL GATE
FOR THE DRIVEWAY LOCATED TO THE RIGHT OF THE BUILDING. THE TARGET
PREMISES IS LOCATED ON THE FIRST FLOOR OF THE RESIDENCE.

## 12 DOVER STREET, HAVERHILL, MA

12 DOVER STREET IS THE LEFT SIDE OF A DUPLEX. THE BUILDING, WHICH IS
MARKED 12 AND 14 DOVER STREET, IS YELLOW IN COLOR WITH WHITE TRIM
AND BLACK SHUTTERS. THE BUILDING HAS TWO DOORS ON THE FRONT. THE
ENTRANCE TO #12 IS THE DOOR ON THE LEFT SIDE AND HAS THE NUMBER "12"
ON THE DOOR. THE BUILDING IS SURROUNDED BY A CHAIN LINK FENCE WITH A
GATE TO THE FRONT ENTRANCE.

## 63 BROOK STREET, 3RD FLOOR, LAWRENCE, MA

63 BROOK STREET IS A THREE STORY BEIGE/YELLOW VINYL SIDED RESIDENCE.
THERE ARE TWO ENTRANCES LOCATED IN THE FRONT OF THE BUILDING. THE
ENTRANCE TO THE LEFT IS MARKED #61 AND THE ENTRANCE TO THE RIGHT IS
MARKED #63. THE DOOR MARKED 63 LEADS TO THE 2ND AND 3RD FLOOR
APARTMENTS. THE TARGET RESIDENCE IS LOCATED ON THE THIRD FLOOR.

## 139 HOW STREET, #204, HAVERHILL, MA

139 HOW STREET IS A THREE STORY, MULTI-FAMILY DWELLING. THE BUILDING IS
TAN IN COLOR WITH RED AND WHITE TRIM. THE MAIN ENTRANCE IS A SINGLE
DOOR THAT LEADS INTO A SMALL FOYER AREA WITH MULTIPLE MAIL BOXES.
ONCE IN THE FOYER AREA, THERE IS ANOTHER LOCKED DOOR TO ENTER THE
DWELLING. THE NUMBER 139 IS LOCATED ON THE TRIM ABOVE THE FRONT
DOOR. THE TARGET RESIDENCE IS APARTMENT #204 INSIDE THE DWELLING.

## 22 HILLTOP STREET, 2ND FLOOR, LAWRENCE, MA

22 HILLTOP STREET IS A TWO STORY LIGHT GREEN VINYL SIDED DWELLING WITH
TWO ENTRANCES IN THE FRONT OF THE BUILDING. BETWEEN THE FRONT
ENTRANCES ARE TWO BLACK MAIL BOXES. THERE IS A DRIVEWAY IN FRONT OF
THE RESIDENCE. THE ENTRANCE ON THE RIGHT LEADS TO THE 2ND FLOOR,
WHICH IS THE TARGET RESIDENCE.

## 82 TEMPLE STREET, 2ND FLOOR, HAVERHILL, MA

82 TEMPLE STREET IS A BEIGE TWO AND A HALF STORY TWO FAMILY DWELLING.
THERE ARE TWO ENTRANCES, ONE IN THE FRONT OF THE BUILDING AND ONE
LOCATED TO THE LEFT REAR OF THE BUILDING. THERE IS A DRIVEWAY
LOCATED TO THE LEFT OF THE RESIDENCE. THE TARGET LOCATION IS LOCATED
ON THE 2ND FLOOR OF THE DWELLING.

## 1855 WASHINGTON STREET, 5J, ROXBURY, MA

1855 WASHINGTON STREET, 5J, ROXBURY, MA IS A MULTI-STORY BRICK
APARTMENT BUILDING OCCUPYING VIRTUALLY THE ENTIRE BLOCK. THE FRONT
ENTRANCE IS A DOUBLE-GLASS DOOR ABOVE WHICH IS THE NAME MANDELA
HOMES. THE TARGET LOCATION IS APARTMENT 5J WITHIN THE BUILDING.

## 1 CLOCKTOWER PLACE, APARTMENT 114, NASHUA, NEW HAMPSHIRE

1 CLOCKTOWER PLACE, NASHUA, NH IS A RED BRICK MULTI-UNIT CONVERTED MILL APARTMENT BUILDING, WITH A LARGE CLOCK DISPLAYED ON THE OUTSIDE. THE MAIN ENTRANCE HAS A GREN AWNING THAT SAYS 1 CLOCKTOWER PLACE. THE TARGET LOCATION IS APARTMENT 114 INSIDE THE BUILDING.

      a.    The areas to be searched at each location include all rooms, attics, basements, and other parts therein that are assigned to, or granted common access by, the residence; any garages, storage rooms, trash containers, and any outbuildings located therein that are assigned the location or have common access with the location.

**ATTACHMENT B**

Items to be seized are more fully described as follows:

1. Drugs, including cocaine, crack cocaine and heroin, and drug paraphernalia, such as scales, strainers, cutting agents, and packaging material such as baggies and glassine envelopes.

2. Any documents related to the drug trafficking or money laundering activities of the Target Subjects, including, but not limited to, bank account records, wire transfer records, bank statements, safe deposit box keys and records, money wrappers, rubber bands, money containers, financial records and notes, showing payment, receipt, concealment, transfer, or movement of money generated from the sale of controlled substances;

3. Drug or money ledgers, drug distribution or customer lists, drug supplier lists, correspondence, notations, logs, receipts, journals, books, records, and other documents noting the price, quantity and/or times when controlled substances or items used to package and distribute controlled substances were obtained, transferred, sold, distributed, and/or concealed;

4. Personal telephone books, address books, telephone bills and documents and other items reflecting names, addresses, telephone numbers that document association among and between the Target Subjects and associates involved in drug trafficking activities;

5. Photographs, letters, cables, telegrams, facsimiles, personal notes and documents and other items that document drug

trafficking and related illegal activities of the Target Subjects
and their associates;

6.    Records, documents and deeds reflecting the purchase or
lease of real estate, vehicles, precious metals, jewelry or other
items, obtained with the proceeds from drug trafficking
activities;

7.    Records of off-site locations to store records,
including safe deposit box keys, records, receipts, and rental
agreements for storage facilities;

8.    Records of mail and communications services, answering
machines, telephone paging devices, beepers, car telephones,
cellular telephones, and other communication devices that
evidence participation in drug trafficking activities;

9.    Records, items and documents reflecting travel for the
purpose of participating in drug trafficking, including
passports, airline tickets, vehicle rental receipts, motor
vehicle registration and ownership records, credit card receipts,
hotel and restaurant receipts, canceled checks, maps, and records
of long distance calls, which reflect domestic and foreign
travel;

10.   Currency in an amount exceeding $1,000, money wrappers,
rubber bands, and devices used to count money;

11.   Records, as used above, shall also include, but is not
limited to, any and all information and/or data stored in the
form of magnetic or electronic coding on computer media or on

media capable of being read by a computer or with the aid of the computer related equipment. Computer equipment (including both hardware and software) may be seized to effect the search for such records, but must be returned within 30 days unless otherwise ordered by the court).

12.  Indicia of occupancy, residency or ownership of the premises described in this warrant, including utility bills, telephone bills, loan payment receipts, rent receipts, trust deeds, lease or rental agreements, addressed envelopes, escrow documents, keys, and bank account records;

13.  Furniture and other items that contain hidden compartments that could be used to store narcotics and/or narcotics proceeds; and

14.  Mementos, including photographs and other historical keepsake items which document the association of the Target Subjects with each other and other suspected drug traffickers.